[L. A. No. 1305.   Department One.—January 18, 1905.]

## ETTA ESTELLE BERRY, Respondent, v. JOHN WARD BERRY, Appellant.

DIVORCE—NEGLECT TO PROVIDE—FINDINGS NOT SUPPORTED—ABILITY NOT PROVEN—UNCORROBORATED EVIDENCE OF PLAINTIFF.—A divorce cannot be granted on the uncorroborated evidence of either of the parties, and where the wife seeks a divorce on the ground of the willful neglect of her husband to provide for her the necessaries of life, he having the ability to do so, and his ability was shown only by the uncorroborated evidence of the wife, and willful neglect was disproved by the testimony for the husband, the findings in favor of the plaintiff are unsupported.

ID.—PUBLIC INTEREST.—The public has an interest in every suit for divorce; and doubts as to the right to a divorce should be resolved against it rather than for it.

ID.—RESIDENCE OF PLAINTIFF.—Taking all the circumstances of the case together, the evidence fails to show a clear case of *bona fide* residence on the part of the plaintiff so as to entitle her to bring the action.

APPEAL from a judgment of the Superior Court of San Bernardino County. Benjamin F. Bledsoe, Judge.

The facts are stated in the opinion of the court.

Will D. Gould, and J. E. Bates, for Appellant.

Henry W. Nisbet, for Respondent.

VAN DYKE, J.—This is an action for divorce. Plaintiff and defendant were married in Middlesex County, Massachusetts, October 18, 1898. The plaintiff alleges in her complaint that for more than one year preceding the commencement of the action she has been and is now a resident of the county of San Bernardino in the state of California.

The complaint contains two counts. In the first it is charged that the defendant for more than a year immediately preceding the commencement of the action had willfully neglected and failed to provide plaintiff with the common necessaries of life, by reason of his profligacy, idleness, and dissipation.

In the second count it is charged that for more than a year immediately preceding the commencement of the action the defendant had willfully neglected and failed to provide plaintiff the common necessaries of life, he having the ability so to do, and had compelled her during said period to live upon the charity of her relatives and friends. The defendant, a resident of Massachusetts, where the parties were married, employed attorneys to defend the action, through whom a verified answer to the complaint was filed. In his answer he denied that the plaintiff had resided in the state of California for more than one year before the commencement of the action, or that at that time she was a *bona fide* resident of the state of California, and alleges that "The plaintiff moved from the commonwealth of Massachusetts into the state of California for the purpose of obtaining a divorce from this defendant for a cause not allowed by law in said commonwealth," and denies that he willfully or at all neglected or failed to provide for plaintiff the common necessaries of life, or that he did so by reason of profligacy, idleness, dissipation, or at all, and denies that he willfully or at all neglected or failed to provide the plaintiff with the common necessaries of life, or had compelled her to live upon the charity of her relatives or friends, or any of them; but, on the contrary, he alleges that he has at all times faithfully kept his marriage vows, and conducted himself toward the plaintiff as a faithful husband should, and alleges that the plaintiff has willfully been absent from the defendant for more than one year from the date of filing the complaint, without any cause or justification, and without the consent of the defendant.

The court found that the plaintiff had been for more than one year preceding the filing of the complaint a *bona fide* resident of the county of San Bernardino, state of California, and that the defendant, for more than one year prior to the filing of the complaint,—to wit, the twenty-ninth day of June, 1901, —had willfully neglected and failed to provide the plaintiff with the common necessaries of life, he, the said defendant,

having during all of said time the ability so to do, and that plaintiff had been compelled to live upon the charity of her relatives and friends. The court, however, found in favor of the defendant in reference to the charge of profligacy, idleness, and dissipation. Judgment was accordingly entered granting a divorce to the plaintiff January 9, 1902.

The defendant, through his attorneys, made a motion for a new trial on various grounds, among others the insufficiency of the evidence to justify the findings, and errors of law, which motion for a new trial was thereafter submitted and denied June 9, 1902. Thereafter, on July 3, 1902, notice of appeal from the judgment, and also from the order denying defendant's motion for a new trial, was served and filed on the part of the defendant.

Appellant, through his counsel, has filed a brief on the appeal, and at the October term of this court in Los Angeles argued and submitted the cause. The respondent has not filed any brief and failed to appear at the hearing of the cause on the argument.

From the record of the evidence contained in the statement on motion for a new trial it appears that the plaintiff was the only witness present at the trial of the cause. All the other evidence was by deposition of the parties in the east, including the father and mother of the plaintiff. The judge who tried the cause in the court below, in summing up the evidence in the case, says: "The only serious question in my mind is whether or not the wife by the burden of proof has shown that her husband is able, or was able during the period of the marriage, to provide her with the common necessaries of life, being firmly convinced as I am that he did not provide her with the common necessaries of life. The testimony shows that he went to Boston every day and returned every night; we are led to infer that he worked while he was there; he testifies that he did work, and carried on his furniture business. There is no testimony which would support a finding of idleness or profligacy or dissipation on his part that I can see in the case. The only question is, Was he able to provide his wife with the common necessaries of life? Our supreme court, and I think very properly, and in keeping with what I would consider to be a natural law, have said that if a man is able to work, but cannot get work, that fact in itself does not give the

wife a ground of divorce. He must have property; he must have something whereby he can provide her with the common necessaries of life. . . . The only testimony I have on that point is the testimony of the wife to the effect that he was continually promising but failed to provide; and it seems to me under all the testimony in the case—and I feel a little reluctant to arrive at that conclusion—but it seems to me under all the testimony in the case that the preponderance of the evidence is to the effect that he was able to provide her with the common necessaries of life, but that he failed and neglected to do so, and for that reason I shall order judgment in favor of the plaintiff on the second ground or cause of action." The law, however, declares in very explicit terms that no divorce can be granted upon the uncorroborated statement of either of the parties to the action. (Civ. Code, sec. 130.) And doubts should be resolved against divorce instead of for it.

"The marriage relation is the foundation of all society. It is not to be severed on slight grounds or for trivial causes; the policy of the law, therefore, is against granting divorces. Unlike other cases, in an action for divorce judgment cannot be rendered for the plaintiff on the default of the defendant, even upon a verified complaint; nor can it be granted upon the uncorroborated statement, admission, or testimony of the parties." (*Hatton* v. *Hatton,* 136 Cal. 353.) While an action to obtain a decree dissolving the relation of husband and wife is nominally an action between two parties, the state, because of its interest in maintaining the same, unless good cause for its dissolution exists, is an interested party. It has been said by eminent writers upon the subject that such an action is really a triangular proceeding, in which the husband and wife and the state are parties. . . . The parties to the action are not the only people interested in the result thereof. The public has an interest in the result of every suit for divorce." (*Deyoe* v. *Superior Court,* 140 Cal. 476.[1]) Upon the statement of the learned judge of the court below that the only testimony with reference to the failure to provide was that of the wife, the judgment of the court below should have been for the defendant. But, in the testimony of the plaintiff herself, she says: "I never knew him to withhold money from me when he had it, and I never knew him to have money around

[1] 98 Am. St. Rep. 73.

him." And there is no evidence in the transcript showing that the defendant did not do the best he could under his circumstances to support his wife.

At the time of the marriage the defendant was twenty-three and the plaintiff about seventeen. The defendant was just starting in as a partner in a business of repairing furniture in Boston, and was obliged to borrow from his sister in starting his business twenty-five hundred dollars, and the evidence is all to the effect that he was an industrious, temperate man, and was never idle when he could get work. His mother and sister, it seems, did not view the marriage favorably, and the sister testifies that she met Mr. Allen, the father of the plaintiff, just before the marriage, and says, "I told him I did not think that my brother could support his daughter in the way his daughter wanted to be supported, and he said, 'I don't care if Ward has not one cent. I can afford to support them if necessary.'" After they were married they went to housekeeping; his folks and her folks assisted in furnishing the house, and her father and mother and their adopted boy went to board with the parties from November until the next March, when the plaintiff and her mother went to Limerick, in Maine, where they remained until the latter part of the following October, 1899. Plaintiff's father in his deposition says: "I think my wife and I lived with Mr. Berry from November until the next March. On no occasion did I make complaint to Mr. Berry in regard to the board." In the transcript appear several letters from the plaintiff to the defendant while she remained at Limerick, of the most endearing character. Soon after their return from Limerick the plaintiff was about to be confined, and the physician who was consulted, it seems, advised taking her to a hospital of which he had charge. The deposition of the physician was introduced on behalf of the plaintiff at the trial. In this he says:—

"Q. I understand you recommended the removal of the plaintiff to the Frost Hospital?—A. I did.

"Q. Did you attend her then?—A. I did.

"Q. Did you render any bill to any one for medical services on this basis?—A. I did.

"Q. To whom?—A. The husband.

"Q. For attendance at the house and hospital both?—A. Covering all attendance on the wife.

"Q. Did the husband pay this bill?—A. He did.

"Q. Did he pay the entire bill?—A. To the best of my knowledge he did.

"Q. Was the bill paid promptly?—A. Reasonably so. Yes, sir. As doctor's bills are paid."

In the deposition of Mrs. Allen, taken in Massachusetts, and read on the trial, she says: "I asked Mr. Berry if he was willing that his wife should go to the hospital and he answered no, that her place was at her home." And it appears from defendant's deposition, as well as otherwise, that at that time the home of the parties was a suitable place for plaintiff's confinement. However, the physician thought he could attend to her better at the hospital; hence the removal there. Mrs. Allen, plaintiff's mother, further in her testimony says:—

"Q. How long was your daughter at the hospital?—A. Two and a half weeks, I think that was the time I paid for.

"Q. You paid the hospital bill for the time she was there? —A. Yes, sir."

In this connection there was produced on behalf of the defendant during the examination of the plaintiff herself on the stand, a letter which the defendant had written to her while she was in California, of which the following is a copy:—

"My DEAR WIFE:                "MALDEN, MASS., June 11, 1900.

"Although I much dislike to refer to this matter you will recollect that your mother made complaint that since I had not paid the bills of Doctor Leeds, she herself was compelled to and did pay it. Yet I was surprised June 9, 1900, to learn from Dr. Leeds that she had paid him nothing whatever. Accordingly on the same date I paid his account, amounting to thirty dollars, as indicated by the copy of his receipt which I herewith mail to you. This I do so that you may not be misled by certain false statements and by various misrepresentations that have been made. You may rest assured of my constant and ever endearing love for you. And you ought to learn very much from this particular instance of misrepresentations here disclosed.                Ever yours,

"J. WARD BERRY."

Accompanying this is a copy of the bill of Dr. Leeds referred to, and which Dr. Leeds, as already shown, testified had been paid by the defendant Berry.

The particular grievance of the plaintiff against the defendant is based upon what she supposed was his neglect to treat her properly and pay the bills while she was at the hospital during her confinement. In her cross-examination she says: "I wrote him a letter and told him that if he could not take care of me through my confinement and pay my bills that I should not live with him another day. That is all I wrote him.—Q. Is that the real cause of your leaving him? —A. That is the real cause. Because I did not care anything about him after his abuse of me; abuses I went through and suffered all through my confinement and before that."

In the defendant's deposition he says: "I was married to the plaintiff at Malden, Massachusetts, October 18, 1898; our domestic relations were happy; I have never had any bad habits; I have always lived a plain and unquestionable life; I have never been a profligate, idle, or dissipated, and never willfully or at all neglected or refused or failed to provide plaintiff with the common necessaries of life." Again he says, after he earned some money as a clerk, "I put that money in the furniture business; I was in the furniture business from October 4, 1897, until the spring of 1900; the money I borrowed from my sister, Mrs. Cressey, I used in the furniture business; the furniture business was not a paying venture. It left me in debt other than to my sister; I had two or three hundred dollars in promissory notes I was obliged to take up; I was about three hundred dollars in debt six months before I gave up the furniture business in the spring of 1900."

The defendant testifies as follows in reference to his wife going to the hospital: "At the time of my wife's confinement the house was all furnished—five rooms; and my wife was provided with all that she needed in the way of food, clothing, and other comforts; the day that my wife went to the hospital the doctor sent for me to go down to his office to see him; he told me that my wife was in a critical condition, and that he did not care to take upon himself the responsibility of caring for her at the house, and that he wished I would consent to have her go to the hospital; I immediately went back and told my wife she had better go; my wife said she did not want to leave her home and she did not want to leave me; after she went to the hospital I packed the furniture up and had it moved over to Mrs. Annie Green's (her aunt) to be stored

there; the same day that my wife went to the hospital she asked as a special favor to have the things and household goods packed up and stored at her aunt's house until she was able to go to housekeeping again; the child was born March 14, 1900, and died March 17th, the following Saturday, and was buried March 20th, and my wife stayed in the hospital one and a half weeks after the death of the baby; while she was at the hospital I called to see her every evening after I was admitted during the time she was there.'' It also appears from bills presented in his deposition that he paid the baby's funeral expenses. He further testified that all of his earnings went to the support of his family after his marriage, and there is nothing in the evidence in reference to his ability to provide for his family inconsistent with his own testimony.

In his deposition he also testifies that the plaintiff in May, 1900, left Massachusetts with her mother and went to California for the purpose of getting a divorce. The plaintiff in her testimony denied that she ever told him she was going to California to get a divorce, but the circumstances surrounding the case seem to corroborate the defendant's statement. She testifies that she deserted him, and just before starting to California she dropped him a note as follows: ''As I am going right away and auntie is soon to move, I sent your things over to your house. All except two carpets and the sideboard and two tables. Those I sold to pay my bills with, or help pay them. The other things are yours, the silver, that is the solid, is in your valise, and the other is in the half barrel which you had better take care of right away. Your clothes are in the packing-box. I shall be many miles away when you receive your things and I thought I would see you had your things all right before I started.'' In her testimony she says: ''My parents have been taking care of me since I have been in California; I have an explanation to offer as to those affectionate letters that have been introduced in evidence while I was living at Limerick. I was a very proud girl, and at that time I was very sick and needed sympathy, and I was too proud to go to my mother for it and so in that feeling I wrote to him. . . . And I did, as a matter of fact, think a great deal of Mr. Berry at that time; I did, I thought quite a little of him.'' Further she says, ''I have not asked him for any money since I came to California.''

"Q. Did he want you to come to California?—A. I did not ask him.—Q. You came right away on your own responsibility?—A. I did, yes sir.—Q. And you never have asked him for any money for your support since then?—A. No, sir."

The evidence on the part of the defendant, which is not contradicted in any material respect, is a complete answer to the plaintiff's complaint of want of care and attention on the part of the defendant during her sickness and confinement at the hospital, and this in fact, according to her own statement, is her principal grievance on the charge of failure to provide on the part of the defendant the common necessaries of life.

Aside from the want of evidence to support the finding on the merits of the action, it appears very plainly that the plaintiff was not a *bona fide* resident of this state so as to entitle her to bring the action, even if a proper ground of divorce existed. According to the testimony of the plaintiff her home at Highlands was with her parents, and in the deposition of her father, Mr. Allen, taken in Massachusetts and used in her behalf on the trial, he says: "I returned from California a year ago last November and my wife returned from California over six months ago. I returned for the purpose of protecting my business here in Boston. . . . I never voted there and do not know that I am a citizen of California. I am a registered voter at Chelsea and voted there at the last state election." It would appear from this, therefore, that the father of the plaintiff was not a citizen of California but a temporary resident, at the most, in Highlands in this state, and there is nothing to show that the plaintiff had a residence independent of that of her parents. There is nothing to show that the defendant ever was in California. His residence is in Boston. It is true she says she deserted him and came to California. Taking all the circumstances together, to say the least, it does not establish a clear case of a *bona fide* residence on the part of the plaintiff. But inasmuch as the evidence utterly fails to support the finding upon the merits, it is not necessary to pass upon the question of residence.

The judgment and order denying a new trial are reversed.

Angellotti, J., and Shaw, J., concurred.